## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HOLY SPIRIT ASSOCIATION FOR THE UNIFICATION OF WORLD CHRISTIANITY, | : : : : | Civil No. 3:18-CV-01508 |
| Plaintiff, | : : | |
| v. | : : | |
| WORLD PEACE AND UNIFICATION SANCTUARY, INC., | : : | |
| Defendant. | : : | Judge Jennifer P. Wilson |

## <u>MEMORANDUM</u>

Before the court are cross-motions for summary judgment.  (Docs. 200, 201.)  Because the court finds that it cannot resolve the merits of the issues presented in either motion, the court will dismiss this case for lack of subject matter jurisdiction on ecclesiastical abstention grounds.

### Factual and Procedural Background[1]

Reverend Sun Myung Moon ("Rev. Moon") founded the Unification Church in Seoul, Korea in 1954.  (Doc. 200-1, ¶ 1.)  The Unification Church expanded quickly, forming branches throughout the world, including in the United States, and is now a global religious organization.  (*Id.* ¶¶ 3–4.)  In 1960, Rev. Moon

---

[1] In considering the parties' motions for summary judgment, the court relied on the uncontested facts, or where the facts were disputed, viewed the facts and deduced all reasonable inferences therefrom in the light most favorable to the nonmoving party in accordance with the relevant standard for deciding a motion for summary judgment.  *See Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 362 (3d Cir. 2008).

married Hak Ja Han ("Mrs. Moon").  (*Id.* ¶ 6.)  Hyung Jin Moon, also known as Sean Moon ("Sean Moon"), is one of Rev. and Mrs. Moon's sons.  (*Id.* ¶ 7.)

Plaintiff Holy Spirit Association for the Unification of World Christianity ("HSA") was established as a branch of the Unification Church in the United States in 1961.  (Doc. 205, p. 2; Doc. 209-9.)[2]  Since 1961, HSA has expanded to 109 chapters with over 16,000 members in 50 states, including Pennsylvania.  (Doc. 200-1, ¶ 11.)  According to HSA officials, the Unification Church "does not have (and never had) denominations."  (*Id.* ¶ 5.)  However, "HSA oversees and has overseen the establishment of local churches throughout the United States in accordance with its governing documents, including the National Charter that was in place in 2013."[3]  (*Id.* ¶ 12.)

In 1965, Rev. Moon created the Twelve Gates, or Tongil, symbol which appears below.  (Doc. 200-1, ¶¶ 20–21; Doc. 201-2, ¶¶ 6–7.)



---

[2] For ease of reference, the court utilizes the page numbers from the CM/ECF header.

[3] The National Charter includes protocols for establishing and closing local churches as well as the appointment and removal of pastors.  (Doc. 200-1, ¶¶ 14–16.)

This image was designed to be "the symbol of [the Unification Church's] activities" and to "be used broadly [for] all witnessing, public relations, service activities, church actives, and our web sites." (Doc. 200-1, ¶ 23.) Indeed, the Unification Church has used the Twelve Gates symbol for over fifty years "to identify its religious services" and the symbol is used in all aspect of its members' lives. (Doc. 201-2, ¶ 12; Doc. 206, ¶ 9; Doc. 210-1, ¶ 24.)

HSA and its local churches use the Twelve Gates symbol in connection with holidays, ceremonies, major events, and on blessing rings that serve as public displays of marriage through the Unification Church. (Doc. 200-1, ¶ 28.) Many HSA local churches also display flags or signs with the Twelve Gates symbol outside of their buildings. (Doc. 205, ¶ 8; Doc. 206, ¶ 9.) In addition, the Twelve Gates symbol is displayed at the entrance to and throughout HSA's offices and at important HSA locations. (Doc. 205, ¶ 8; Doc. 206, ¶ 9.) While the Twelve Gates symbol is usually red, as pictured above, it has also been displayed in a variety of colors, including on gold jewelry. (Doc. 200-1, ¶ 37.)

On June 30, 2009, HSA registered the Twelve Gates symbol with the United States Patent and Trademark Office ("USPTO") for "religious prayer services," "religious and spiritual services," and "ministerial services" (Registration Number – 3,646,838; Serial Number – 77,626,340). (*Id.* ¶ 34.) As of October 7, 2019, the Twelve Gates mark was still registered, active, and owned by HSA. (Doc. 211-3.)

According to HSA, limited use of the Twelve Gates symbol is permitted by the Unification Theological Seminary ("UTS"), HSA's seminary,[4] and Gary Fleischer, an HSA member who uses the symbol on his website, which archives Unification Church documents.[5]  (Doc. 200-1, ¶¶ 40, 42.)

Around 2001, Rev. Moon created the phrase "Cheonju Pyeonghwa Tongil Guk," or in shorthand, "Cheon Il Guk," which roughly translates to "Kingdom of God," or "One Heavenly Nation" from the Korean language.  (*Id.* ¶ 45.)  Like the Twelve Gates symbol, HSA asserts that the phrase "Cheon Il Guk" has been fully integrated into its activities, including the "Cheon Il Guk constitution, the Cheon Il Guk anthem, its Cheon Il Guk leaders, and its Cheon Il Guk calendar years," as well as publications, banners, and merchandise.  (*Id.* ¶¶ 46–48 (cleaned up).)  The phrase has also been incorporated into another symbol for the Family Federation for World Peace and Unification ("Family Federation"), which appears below.[6]  (*Id.* ¶ 49.)

---

[4] UTS was founded by Rev. Moon and shares its leadership positions with HSA.  (Doc. 200-1, ¶ 41.)

[5] As part of Fleischer's use of the Twelve Gates symbol, HSA requires Fleischer to display a disclaimer on his website that the site is not an official site of HSA.  (Doc. 207-1, pp. 8–9.)

[6] The Family Federation is the name under which HSA "market[s] its religious services" in the United States.  (Doc. 201-2, ¶ 4.)



On September 14, 2015, HSA applied to register "Cheon Il Guk" as a trademark with the USPTO, but these proceedings have been stayed pending the outcome of the instant litigation.  (*Id.* ¶¶ 51–53.)

Rev. Moon, the founder and creator of Unificationism, passed away in September 2012.  (*Id.* ¶ 57.)  Thereafter, Sean Moon disputed Mrs. Moon's authority to lead the Unification Church, and formed Defendant World Peace and Unification Sanctuary, Inc. ("Sanctuary") around 2013 "with the stated mission of spreading Rev. Moon's teachings."[7]  (*Id.* ¶¶ 57–59.)  Sanctuary is a separate entity from HSA with its own certificate of incorporation, bylaws, and governance structure, all of which are "unauthorized" under HSA's national charter.  (*Id.* ¶¶ 64, 66.)

---

[7] Sanctuary denies that Mrs. Moon is the legitimate leader of the Unification Church since Sean Moon claims to be Rev. Moon's "true heir."  (Doc. 200-1, ¶¶ 61–63.)  Thus, "Sanctuary's followers believe that Sean Moon adheres to the true teachings of Rev. Moon and teaches 'orthodox' faith of Unificationism.  By contrast, Sanctuary's followers believe that [Mrs. Moon]'s teachings are heretical."  (Doc. 201-2, ¶ 51.)

As part of its work, Sanctuary promotes two ministries: religious services, which Sanctuary classifies as the practice of Unificationism that promotes the teachings of Rev. Moon, but rejects Mrs. Moon's ability and qualifications to oversee the Unification Church; and "Rod of Iron" ministries, which is intended to "target a broad audience of Christians, who believe in the use of firearms but who may be less interested in or familiar with the theology of Sanctuary church." (*Id.* ¶¶ 68, 83.) As part of both ministries, Sanctuary utilizes the Twelve Gates symbol to the same extent as HSA; however, Sanctuary primarily displays the symbol in gold.[8] (*Id.* ¶¶ 70–72, 75–76, 85, 87; Doc. 201-2, ¶¶ 7–21.) The Twelve Gates symbol appears on Sanctuary's signs and websites, including its YouTube channel on which it broadcasts its services.[9] (Doc. 200-1, ¶¶ 75–77, 80–81.) The Twelve Gates symbol is also incorporated into a new symbol for Sanctuary's "Rod of Iron" ministries, which appears below. (*Id.* ¶¶ 85–86.)

---

[8] Sanctuary refers to the Twelve Gates symbol as the Tongil symbol, which differs only in name. (Doc. 200-1, ¶ 72.) For consistency, the court will refer to the symbol as the Twelve Gates symbol, but in doing so does not indicate that there are different symbols.

[9] Sanctuary began broadcasting its services and content online via YouTube and other streaming platforms in 2015. (Doc. 200-1, ¶ 105.)



This symbol is also used on Sanctuary's signs and websites, including its YouTube channel.  (*Id.* ¶ 87.)  Thus, Sanctuary has used the Twelve Gates symbol in various iterations since its inception.[10]  (Doc. 201-2, ¶¶ 52–53.)

In 2015, HSA submitted a complaint to YouTube requesting that Sanctuary's videos depicting the Twelve Gates symbol be removed as infringing on its trademark.  (*Id.* ¶ 97.)  YouTube declined to remove these videos.  (Doc. 206-2.)  Thereafter, on May 3, 2016, HSA sent Sanctuary a cease and desist letter, requesting that Sanctuary immediately stop utilizing the Twelve Gates symbol in connection with its activities.  (Doc. 200-1, ¶ 100.)  Sanctuary responded to this letter on May 31, 2016, asserting that "any and all assets of HSA-UWC, including all trademarks and symbols, remain under the authority of [Sean Moon]."  (*Id.* ¶ 101.)  On September 22, 2016, HSA responded to Sanctuary's May 31, 2016

---

[10] Likewise, Sanctuary has used the phrase "Cheon Il Guk" extensively in its practice of Unificationism.  (Doc. 201-2, ¶¶ 30–37, 39–40.)

letter stating that "[a]t no time while [Sean] Moon was the President of HSA-UWC, or after he resigned from that office on July 10, 2013, did HSA-UWC assign or license the Twelve Gates symbol or any other mark to [Sean] Moon or Sanctuary." (*Id.* ¶ 102.)  Based on the record, it does not appear that any other efforts were made to curtail Sanctuary's use of the Twelve Gates symbol until the instant lawsuit was filed on July 30, 2018.  (Doc. 1.)

On February 28, 2018, Sanctuary held a blessing ceremony involving "Sanctuary's congregants carrying semi-automatic guns as part of the ceremony."[11] (Doc. 200-1, ¶ 106.)  The Twelve Gates symbol was prominently displayed during the event.  (*Id.* ¶ 107.)  Certain news outlets reporting on this event initially indicated that Sanctuary was associated with the Unification Church, a fact which HSA vehemently disputed, and continues to dispute.  (*Id.* ¶¶ 112–116, 124–125.) HSA has since undertaken efforts to clear up this alleged confusion, including by issuing press releases, letters to news outlets, verbal corrections, and the institution of the instant litigation.  (*Id.* ¶¶ 113–116; Doc. 1.)

This action was initiated via complaint on July 30, 2018.  (Doc. 1.) Sanctuary responded with an answer and counterclaims against HSA on September 26, 2018.  (Doc. 13.)  HSA moved to dismiss Sanctuary's counterclaims, but this

---

[11] This ceremony occurred "two weeks after the mass shooting in Parkland, Florida" and attracted significant media attention.  (Doc. 200-1, ¶¶ 109–110.)

motion was denied by United States District Judge Robert D. Mariani on July 22, 2019.  (Docs. 81, 82.)  By agreement of the parties, the court permitted HSA to file an amended complaint on July 31, 2019, the operative complaint, alleging federal trademark infringement and unfair competition under the Lanham Act (Count I) and common law unfair competition (Count II).  (Doc. 93.)  On August 7, 2019, Sanctuary filed an answer with affirmative defenses as well three counterclaims pursuant to the Lanham Act for cancellation of a registered trademark (Count I), declaratory judgment of non-infringement and no unfair competition (Count II), declaratory judgment of no dilution (Count III), and one counterclaim for declaratory judgment on non-infringement of "Cheon Il Guk" and that "Cheon Il Guk" is generic and fails to function as a trademark (Count IV).  (Doc. 101.)  HSA answered Sanctuary's counterclaims on August 27, 2019.  (Doc. 106.)  On September 26, 2019, the parties stipulated that Sanctuary's third counterclaim regarding dilution would be dismissed.  (Doc. 115.)  The court accepted this stipulation on September 30, 2019.  (Doc. 116.)

On October 7, 2019, the parties filed cross motions for summary judgment as well as a number of miscellaneous motions related to the cross motions for summary judgment.  (Docs. 119, 120, 129, 135, 142, 156, 158, 164, 167, 177.)  Due to the state of the record after resolving this flurry of motions, the court denied the cross motions for summary judgment without prejudice and granted the parties

leave to refile their motions in compliance with the court's order.  (Doc. 191.)  On

January 8, 2021, the parties re-filed the instant cross motions for summary

judgment in accordance with the parameters set by the court.  (Docs. 200, 201.)

These motions have been fully briefed and are ripe for disposition.[12]  (Docs.

202–216, 219–225.)

### STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 sets forth the standard and procedures for

resolving a summary judgment motion.  Rule 56(a) provides that "[t]he court shall

grant summary judgment if the movant shows that there is no genuine dispute as to

any material fact and the movant is entitled to summary judgment as a matter of

law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317,

322–323 (1986).  A factual dispute is "material" if it might affect the outcome of

the suit under the applicable substantive law, and is "genuine" only if there is a

sufficient evidentiary basis that would allow a reasonable fact-finder to return a

verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

248 (1986).  When evaluating a motion for summary judgment, a court "must view

the facts in the light most favorable to the non-moving party" and draw all

---

[12] The court notes that Sanctuary's briefs with respect to its motion for summary judgment include a notation in the caption which reads "oral argument requested."  (Doc. 202, p. 1; Doc. 223, p. 1.)  However, this request does not appear anywhere else in the parties' briefs, Sanctuary does not indicate why oral argument is necessary in this case, and the court otherwise finds that oral argument is not warranted.  Therefore, the court will deny the request for oral argument to the extent it is raised.

reasonable inferences in favor of the same. *Hugh v. Butler Cty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).

The moving party bears the initial burden of demonstrating the absence of a disputed issue of material fact. *See Celotex*, 477 U.S. at 324. "Once the moving party points to evidence demonstrating no issue of material fact exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor." *Azur v. Chase Bank, USA, Nat'l Ass'n*, 601 F.3d 212, 216 (3d Cir. 2010). The non-moving party may not simply sit back and rest on the allegations in its complaint; instead, it must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (internal quotations omitted); *see also Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001). Further, the non-moving party cannot rely on "general denials or vague statements." *Shaeffer v. Schamp*, No. 06-1516, 2008 WL 2553474, at *4 (W.D. Pa. June 25, 2008) (quoting *Trap Rock Indus. v. Local 825, Int'l Union of Operating Eng'rs*, 982 F.2d 884, 890 (3d Cir. 1992)). Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial." *Celotex*, 477 U.S. at 322–23. "Such affirmative evidence

– regardless of whether it is direct or circumstantial – must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." *Saldana*, 260 F.3d at 232 (quoting *Williams v. Borough of West Chester*, 891 F.2d 458, 460–61 (3d Cir. 1989)).

## DISCUSSION

In HSA's motion for summary judgment, HSA argues that the Twelve Gates symbol is a valid trademark to which Sanctuary has no colorable claim; that Sanctuary infringed on HSA's trademark rights to the Twelve Gates symbol; and that Sanctuary has no valid affirmative defenses to HSA's trademark infringement claim. (Doc. 202.) Specifically, HSA asserts that it is the exclusive owner of the Twelve Gates symbol by virtue of its trademark, registered at No. 77,626,340 issued on June 30, 2009 by the USPTO, which remains "valid, subsisting, uncancelled[,] and unrevoked." (*Id.* at 22.) In support of this assertion, HSA states that it has "continuously used the Twelve Gates Mark in a manner that strongly connects the Mark in the mind of the public with the Unification Church." (*Id.*) HSA posits that Sanctuary infringed on its rights to the Twelve Gates symbol because Sanctuary's use of the symbol has created confusion in the community regarding Sanctuary's relationship to HSA. (*Id.* at 34–38.) Finally, HSA asserts that Sanctuary's affirmative defenses fail as a matter of law since the Twelve Gates symbol is not generic, HSA has not acquiesced to Sanctuary's use of the symbol,

laches does not bar HSA's claims, and because HSA continues to use and protect the Twelve Gates symbol. (*Id.* at 39–44.) Accordingly, HSA seeks summary judgment on its trademark infringement claim under the Lanham Act, its common law unfair competition claim, and on all of Sanctuary's counterclaims and affirmative defenses. (Doc. 200.)

Sanctuary's motion for summary judgment, in contrast, argues that the Twelve Gates symbol is a generic or universal religious symbol akin to a cross or the Star of David which is not subject to trademark protection. (Doc. 201-1, pp. 16–19.) Specifically, Sanctuary asserts that the Twelve Gates mark "conveys affiliation with Unificationism—not a particular sect within Unificationism." (*Id.* at 20.) Sanctuary also argues that HSA has abandoned its trademark rights by permitting the unlicensed use of the Twelve Gates symbol. (*Id.* at 23–24.) Indeed, Sanctuary asserts that it has used the Twelve Gates symbol since its inception without any enforcement action taken until the instant litigation. (*Id.*) Sanctuary raises the same arguments with respect to the phrase "Cheon Il Guk." (*Id.* at 25–27.) Finally, Sanctuary argues that the court should abstain from resolving any of the disputes raised in this litigation on the basis of the ecclesiastical abstention doctrine because its affirmative defenses, which the court is required to resolve in order to determine whether summary judgment should be granted in this case, involve court inquiry into the operations of the Unification church—an inquiry

prohibited by the First Amendment.  (*Id.* at 28–30.)  Accordingly, Sanctuary seeks an order denying HSA's trademark infringement claim, cancelling HSA's trademark registration to the Twelve Gates symbol and confirming its allegedly unprotectable nature, and declaring that a trademark may not issue for the phrase "Cheon Il Guk."  (Doc. 201.)

Based on the arguments presented by the parties, as a threshold matter, the court must analyze whether it has subject matter jurisdiction to hear this case. *Hamilton v. Bromley*, 862 F.3d 329, 334 (3d Cir. 2017) (noting that courts are obligated to consider subject matter jurisdiction as an "antecedent question"). Indeed, district courts are continually obligated to review whether they have subject matter jurisdiction and must raise subject matter jurisdiction issues sua sponte. *See Fort Bend Cnty, Tex. v. Davis*, 139 S. Ct. 1843 (2019).  It is axiomatic that where a court lacks subject matter over a case, it cannot address the issues presented in the case.  The Supreme Court has noted that:

> Subject-matter jurisdiction, then, is an Art. III as well as a statutory requirement; it functions as a restriction on federal power, and contributes to the characterization of the federal sovereign.  Certain legal consequences directly follow from this.  For example, no action of the parties can confer subject-matter jurisdiction upon a federal court.  Thus, the consent of the parties is irrelevant, principles of estoppel do not apply, and a party does not waive the requirement by failing to challenge jurisdiction early in the proceedings.

*Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982) (internal citations omitted).  The fundamental importance of

subject matter jurisdiction is echoed in the Federal Rules of Civil Procedure, which mandate dismissal where subject matter jurisdiction is lacking.  *See* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject matter jurisdiction, the court must dismiss the action.").

Accordingly, before turning to the merits of the disputes presented for the court's review, to which the parties have dedicated almost all of their briefing, the court takes up the jurisdictional question raised in Sanctuary's affirmative defenses regarding ecclesiastical abstention.[13]

The ecclesiastical abstention doctrine stems from the First Amendment's provision that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."  U.S. CONST. AMEND. I.  "This

---

[13] The court recognizes that there is a split in authority regarding whether the ecclesiastical abstention doctrine serves as an affirmative defense or a jurisdictional bar to a court's review. *See Edley-Worford v. Va. Conf. of the United Methodist Church*, 430 F. Supp. 3d 132, 136 n.1 (E.D. Va. 2019) ("While neither the Supreme Court, or the Fourth Circuit, has provided explicit guidance as to whether the ecclesiastical abstention doctrine challenge constitutes a Rule 12(b)(1) jurisdictional bar, as opposed to a Rule 12(b)(6) affirmative defense, most courts have viewed the ecclesiastical abstention doctrine through a 12(b)(1) lens.") (citing *Bryd v. DeVeaux*, 2019 WL 1017602, at *4 (D. Md. Mar. 4, 2019) ("Defendants first argue that the First Amendment ecclesiastical abstention doctrine presents a jurisdictional bar to Plaintiff's claim."); *Gregorio v. Hoover*, 238 F. Supp. 3d 37, 45 (D.D.C. 2017) ("[W]ithout definitive guidance otherwise from the Supreme Court or the D.C. Circuit, the Court will analyze defendants' arguments under the ecclesiastical abstention doctrine . . . under a Rule 12(b)(1) lens."); *Kavanagh v. Zwilling*, 997 F. Supp. 2d 241, 248 n.7 (S.D.N.Y. 2014) ("It is somewhat unclear whether the First Amendment serves as jurisdictional bar or an affirmative defense to claims that require courts to review ecclesiastical decisions.  Most district courts to consider the question have treated it as jurisdictional."). In the absence of any controlling precedent, the court will join the majority of courts to have considered the issue and will treat the ecclesiastical abstention doctrine as a jurisdictional issue under Rule 12(b)(1).

clause applies to the judiciary as well as the legislature, *Kreshik v. St. Nicholas Cathedral*, 363 U.S. 190, 191 (1960), and limits the power of the courts to hear suits 'whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by . . . church judicatories. . . .'" *Ogle v. Hocker*, 279 F. App'x 391, 395 (6th Cir. 2008) (quoting *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 727 (1871); *Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696 (1976)). Thus, courts have held that "the First Amendment severely circumscribes the role that civil courts may play in resolving church property disputes." *Id.*, at 449. "Most importantly, the First Amendment prohibits civil courts from resolving church property disputes on the basis of religious doctrine and practice." *Jones v. Wolf*, 443 U.S. 595, 602 (1979) (citing *Milivojevich*, 426 U.S. at 710; *Maryland & Virginia Churches v. Sharpsburg Church*, 396 U.S. 367, 368 (1970); *Presbyterian Church I*, 393 U.S., at 449).

Rather, courts employ the "non-entanglement principle," which "requires that civil courts defer to the resolution of issues of religious doctrine or polity by the highest court of a hierarchical church organization." *Askew v. Trs. of the Gen. Assembly of the Church of the Lord Jesus Christ of the Apostolic Faith, Inc.*, 684 F.3d 413, 418 (3d Cir. 2012) (quotation marks omitted) (quoting *Jones*, 443 U.S. at 602). Therefore, civil courts will "accept decisions of the highest religious

decision-maker as binding fact, so long as those decisions are not tainted by fraud

or collusion." *Id.* (citing *Milivojevich*, 426 U.S. at 713).

As a corollary to these principles, the Court of Appeals for the Third Circuit

has explained that:

> the First Amendment does not remove from the purview of civil courts
> all controversies involving religious institutions. *Jones*, 443 U.S. at
> 602–03. When a church dispute turns on a question devoid of doctrinal
> implications, civil courts may employ neutral principles of law to
> adjudicate the controversy. *Id.*; *Presbyterian Church*, 393 U.S. at 449;
> *Scotts African Union Methodist Protestant Church v. Conference of
> African Union First Colored Methodist Protestant Church*, 98 F.3d 78,
> 88–90 (3d Cir. 1996). Pennsylvania courts opt to apply neutral civil
> law principles whenever possible to resolve such cases. *See, e.g.*,
> *Presbytery of Beaver-Butler of the United Presbyterian Church in the
> U.S. v. Middlesex Presbyterian Church*, 489 A.2d 1317, 1320–23 (Pa.
> 1985).

*Askew*, 684 F.3d at 418–19. The Third Circuit has emphasized that the question of

whether a dispute is one of church governance and doctrine or one that may be

resolved by applying neutral principles of law is a fact-intensive inquiry. *Scotts

African Union*, 98 F.3d at 94–95 ("[T]he extent to which a court may permissibly

inquire into [ecclesiastical] disputes . . . turns on the specific elements of the

inquiry itself and the degree to which it might trench upon doctrinally sensitive

matters, rather than on conclusory labeling of the whole dispute as either 'secular'

or 'ecclesiastical.'").

In this case, HSA asserts that the court can resolve its trademark dispute under the Lanham Act based on purely secular principles of law, i.e., trademark law.[14]   The court will address the elements of the claim simply in order to determine whether the instant dispute may be resolved by applying neutral principles of law, rather than to resolve the merits of the case.   To state a claim for federal trademark infringement under 15 U.S.C. § 1114, "a plaintiff must demonstrate that (1) it has a valid and legally protectable mark; (2) it owns the mark; and (3) the defendant's use of the mark to identify goods or services causes a likelihood of confusion."   *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir. 2000).   With respect to the first two elements, "[r]egistration of a mark under the Lanham Act constitutes prima facie evidence of the mark's validity and its ownership by the registration."   *Members First Fed. Credit Union v. Members 1st Fed. Credit Union*, 54 F. Supp. 2d 393, 403 (M.D. Pa. 1999) (citing 15 U.S.C. § 1115).   With respect to the third element, the Third Circuit has specified ten factors to be considered in determining whether a

---

[14] The court's discussion below regarding trademark infringement under the Lanham Act is equally applicable to HSA's common law claim for unfair competition since "[t]he Pennsylvania common law of unfair competition generally tracks federal law" under the Lanham Act. *Magnesita Refractories Co. v. Tianjin New Century Refractories Co.*, No. 1:17-cv-1587, 2019 U.S. Dist. LEXIS 32559, at *44 (M.D. Pa. Feb. 28, 2019) (citing *Diodato v. Wells Fargo Ins. Servs., USA, Inc.*, 44 F. Supp. 3d 541, 571 (M.D. Pa. 2014)); *see also UHS of Del., Inc. v. United Health Servs.*, 227 F. Supp. 3d 381, 404 (M.D. Pa. 2016) (granting summary judgment on state law unfair competition claims, which were found to be "necessarily dependent upon the success of the federal claims").

defendant's use of its mark to identify goods or services creates a likelihood of confusion:

> (1) the degree of similarity between the owner's mark and the allegedly infringing mark; (2) the strength of the owner's mark; (3) the price of the goods and other factors indicating the care and attention one expects would be given when making a purchase; (4) the length of time the alleged infringer has used the mark without evidence of actual confusion arising; (5) the intent of the alleged infringer in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods are marketed through the same channels; (8) the extent to which the target markets are the same; (9) the perceived relationship of the goods, whether because of their near-identity, similarity of function, or other factors; and (10) other facts suggesting that the prior owner might be expected to expand into the alleged infringer's market.

*A & H Sportswear, Inc.*, 237 F.3d at 215.

While it is undisputed that the Twelve Gates symbol is registered with the USPTO in HSA's name, Sanctuary contends that the Twelve Gates symbol is not entitled to trademark protection because the symbol has become generic as a universal religious symbol that represents Unificationism generally. In addition, Sanctuary asserts that HSA does not own the Twelve Gates symbol because Sean Moon, as Rev. Moon's son, inherited all rights to the Unification Church's intellectual property "as the only true and rightful successor to the Rev. Sun Myung Moon." (Doc. 101, ¶ 70.)

With respect to the first element: whether the Twelve Gates symbol is a valid and legally protectable mark, the court finds that HSA's registration of the Twelve Gates symbol with the USPTO constitutes prima facie evidence of a valid

trademark.  The court is capable of making this finding on neutral principles of law.  However, because Sanctuary has challenged this evidence, and asserted that the Twelve Gates symbol has become generic and is therefore not entitled to trademark protection, the court turns to the question of whether this symbol has become generic.

Generic terms are those "which function as the common descriptive name of a product class."  *A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 296 (3d Cir. 1986).  In other words, a "generic term is one that refers to the genus of which the particular product is a species."  *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 194 (1985).  The Lanham Act "provides no protection for generic terms because a first-user of a term 'cannot deprive competing manufacturers of the product of the right to call an article by its name.'"  *E.T. Browne Drug Co. v. Cococare Prods., Inc.*, 538 F.3d 185, 191 (3d Cir. 2008) (quoting *A.J. Canfield*, 808 F.2d at 297).  Thus, the Act states that a registered mark that "becomes the generic name for the goods or services, or a portion thereof, for which it is registered" may be canceled "[a]t any time."  15 U.S.C. § 1064(3).

According to Sanctuary, the Twelve Gates symbol is the common descriptive symbol for the Unification religion, rather than serving as a symbol specific to HSA as a branch of the Unification Church.  While HSA has not contested this assertion, there has been no evidence presented that the Unification

Church uses this symbol as its identifying mark.  Indeed, the only evidence presented in this case is that Rev. Moon, the founder of Unificationism, created the Twelve Gates symbol, and that Sanctuary and HSA both use this symbol as an identifying mark for their practice of Unificationism.  However, no evidence has been presented regarding other countries' use of the Twelve Gates symbol vis-à-vis Unificationism, let alone whether the Unification Church has adopted the Twelve Gates symbol as representative of the Unification religion generally.

Thus, the implicit question raised by this issue is whether Sanctuary can be classified as a branch of the Unificationist church in light of the apparent fundamental disagreements between the parties relating to the beliefs and practice of this religion.  Indeed, while Sanctuary classifies itself as a Unificationist church, HSA vehemently disputes this assertion.  The voluminous record that has been produced discusses the parties' beliefs and practices of their versions of Unificationism at length; however, it is well-settled that the court cannot resolve church disputes on the basis of religious doctrine and practice.  *Jones*, 443 U.S. at 602 ("Most importantly, the First Amendment prohibits civil courts from resolving church property disputes on the basis of religious doctrine and practice.").  It is therefore not appropriate for the court to determine whether Sanctuary is considered a Unificationist church, and by extension, whether its representations that it utilizes the Twelve Gates symbol to identify its religious practice would be

sufficient evidence for the court, or a jury, to determine that the Twelve Gates symbol has become a generic religious symbol incapable of protection by trademark.

Even if the court could resolve the first element of HSA's trademark infringement claim without running afoul of the First Amendment, it would face additional difficulty with the second element: HSA's purported ownership of a trademark for the Twelve Gates symbol. As with the first element of HSA's claim, the court finds that HSA's registration of the Twelve Gates symbol with the USPTO constitutes prima facie evidence that it owns this trademark right and can accordingly be determined by application of neutral principles of law. However, Sanctuary has contested HSA's ownership on inherently religious grounds. Specifically, Sanctuary has alleged that Sean Moon is the owner of all Unificationist property as the heir of Rev. Moon, and that he therefore owns the trademark to the Twelve Gates symbol since he controls the Unificationist Church, and by extension, HSA as a branch of same.

Plainly, this is a dispute that the court cannot resolve without venturing into issues of church leadership or organization—an area in which the Southern District of New York and the Second Circuit have already determined is inappropriate in a similar dispute presented by the same parties. *See Hyung Jin Moon v. Hak Ja Han Moon*, 833 F. App'x 876, 878–880 (2d Cir. 2020) (finding that "there are no

neutral principles by which we can adjudicate these claims without deciding the religious question of who the rightful successor to the late Rev. Moon is"); *Moon v. Moon*, 431 F. Supp. 3d 394, 404–409 (S.D.N.Y. 2019) (finding that the ecclesiastical abstention doctrine prohibits court review of "intrachurch succession disputes, such as the one at issue here").  While not binding on this court, the court finds that these two cases, which present strikingly similar issues to those in the instant case, are persuasive and helpful authority to aid in the resolution of this case.  Thus, with respect to the second element of HSA's trademark infringement claim, the court must once again apply the ecclesiastical abstention doctrine, which precludes resolution of this claim.

Likewise, even if the court could resolve the first two elements of HSA's trademark infringement claim, the court finds that the third element, likelihood of confusion, cannot be resolved by reliance on neutral principles of law. Specifically, the court finds that Sanctuary's contention that it practices Unificationism adds an extra element of confusion to the confusion analysis.  The likelihood of confusion element exists "'when the consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a *different* product or service identified by a similar mark.'" *Fisons Horticulture, Inc. v. Vigoro Indus.*, 30 F.3d 466, 472 (3d Cir. 1994) (quoting

*Dranoff-Perlstein Assoc. v. Sklar*, 967 F.2d 852, 862 (3d Cir. 1992) (emphasis added)).

As the court has already explained, there is some inherent confusion regarding Sanctuary's status vis-à-vis the Unification Church. HSA argues that Sanctuary and its members do not practice Unificationism; Sanctuary asserts that it does. There are no neutral principles of law available to assist the court, or a jury, in resolving the question of whether Sanctuary's members subscribe to a sect of Unificationism versus the Unification Church generally. Thus, the court cannot resolve the following questions without delving into religious matters: whether Sanctuary is a sect of Unificationism; if Sanctuary is a sect of Unificationism, whether Sanctuary should be able to utilize the Twelve Gates symbol; and whether the likelihood of confusion between HSA and Sanctuary matters if Sanctuary is a branch of the Unification Church. These questions are fundamental to the outcome of this suit. Because they cannot be resolved on neutral principles of law, the court finds that abstention on ecclesiastical grounds is necessary. Ecclesiastical abstention creates a jurisdictional bar for the court's review, and dismissal of this case is accordingly mandated pursuant to Federal Rule of Civil Procedure 12(h)(3).

The court finds that the concerns outlined above are equally applicable to Sanctuary's remaining counterclaims in this case: cancellation of the registered trademark for the Twelve Gates symbol (Count I); declaratory judgment that

Sanctuary did not infringe on HSA's trademark or unfairly compete under common law (Count II); and declaratory judgment that the phrase "Cheon Il Guk" is generic, fails to function as a trademark, and that Sanctuary otherwise did not infringe on HSA's purported rights with respect to this phrase (Count IV). (Doc. 101.) These counterclaims are grounded on the same arguments and principles as HSA's claims in this case.[15] Thus, based on the reasons outlined above, the court lacks neutral principles of law on which it can resolve these issues.

In light of the court's inability to resolve the claims presented in this case based on ecclesiastical abstention grounds, the court finds that it lacks subject matter jurisdiction over this dispute.[16] Thus, pursuant to Federal Rule of Civil Procedure 12(h)(3), the court must dismiss this action.

---

[15] The court notes that Sanctuary's counterclaim regarding the phrase "Cheon Il Guk" would proceed through the trademark infringement analysis detailed above without the prima facie evidence of a registered trademark on HSA's part. However, Sanctuary's affirmative defenses present the same issues that the court has discussed above with respect to the Twelve Gates symbol. To avoid the redundant exercise of repeating the same analysis for this phrase, the court incorporates its discussion above as applicable to the phrase "Cheon Il Guk" and finds abstention equally appropriate.

[16] In light of the court's findings that it lacks jurisdiction to resolve the claims and counterclaims in this case, the court does not consider the remaining affirmative defenses raised by Sanctuary.

**CONCLUSION**

For the foregoing reasons, the court will dismiss this case for lack of subject

matter jurisdiction.  An appropriate order will issue.

<div style="margin-left: 40%;">

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Court Judge
Middle District of Pennsylvania

</div>

Dated: March 30, 2022